Thomas J. SUEL and Amelia K. Suel, Parents and Next Friends of David J. Suel, Petitioners,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–935V.

United States Court of Federal Claims.

Dec. 21, 1993.

Robert T. Moxley, Cheyenne, WY, attorney for petitioners.

Richard A. Schollmann, Washington, DC with whom was Asst. Atty. Gen. Frank W. Hunger, for respondent.

## OPINION

MEROW, Judge.

This vaccine case comes before the court on a motion for review filed by the petitioners on July 19, 1993, challenging the Special Master's June 18, 1993 decision in this matter.[1]

Petitioners, Thomas and Amelia Suel, on behalf of their son David Suel, commenced an action in this court on September 27, 1990, under the National Childhood Vaccine Compensation Act of 1986, *codified as amended* at 42 U.S.C. §§ 300aa–1 *et seq.* (West Supp. 1991) (Vaccine Act). Petitioners allege that David suffered significant aggravation of his tuberous sclerosis (TS) in the form of an encephalopathy and a residual seizure disorder within three days after receiving his first DPT vaccination on October 22, 1986. The respondent challenged petitioners' contention on the ground that the onset of David's seizure disorder occurred outside the Table time limits and, in the alternative, David's current condition is due to his tuberous sclerosis and is unrelated to the administration of the vaccine.

Hearings were held on October 21, 1991 (at the Mayo Clinic) and on November 13, 1991. Testifying for the petitioners was Dr. Manuel Gomez[2], Dr. Marcel Kinsbourne, Mrs. Amelia K. Suel, and Mr. Thomas J.

Suel. Testifying for respondent was Dr. Huntley Hardison. Special Master Millman issued her decision on June 18, 1993 denying compensation. She determined that the petitioners satisfied their burden of proving on-Table onset of David's first seizure, but failed to satisfy their burden of showing that the DPT vaccine significantly aggravated his tuberous sclerosis, 42 U.S.C. § 300aa–13(a)(1)(A), or that the residual effects of the vaccination lasted more than six months, 42 U.S.C. § 300aa–11(c)(1)(D)(i). The Special Master held that the respondent had satisfied its burden of proving that David's condition is due to his tuberous sclerosis, a factor unrelated to the DPT vaccination. 42 U.S.C. § 300aa–13a(a)(1)(B). Pursuant to 42 U.S.C. § 300aa–12(e)(1), petitioners filed a timely motion on July 19, 1993, seeking review in this court of the Special Master's decision.

## FACTS

David Suel was born on June 8, 1986 in Shakopee, Minnesota. Although he was subsequently diagnosed with TS, he appeared normal at birth and had not exhibited any clinical manifestations of his disease. At the age of five months, David received his first DPT vaccination on October 22, 1986. Amelia Suel testified that on October 24, 1986, she noticed that David's eyes rolled back into his head. Although Mrs. Suel thought it was unusual, at the time she and her husband interpreted David's eye-rolling as a sign of sleepiness or as a temporary reaction to his DPT vaccine.[3] During the following week,

---

1. The record in this case is comprised of all filings with the court. The following abbreviations will be used in this opinion: the petitioners' medical records filed as exhibits in the September 11, 1990 Petition for Compensation ("Med.Recs. at ___"), transcript of November 6, 1991 hearing testimony ("Tr. at ___), transcript of Dr. Manual Gomez's October 21, 1991 testimony ("Gomez Tr. at ___), Special Master Millman's June 18, 1993 Decision ("Dec. at ___), Petitioner's Motion for Review ("P.Mot. at ___), Respondent's Response to Motion for Review ("R.Resp. at ___").

2. Dr. Gomez is a pediatric neurologist regarded as the world's leading expert on tuberous sclerosis. A hearing was held on October 21, 1991 at the Mayo Clinic, Rochester, Minnesota, to take the testimony of Dr. Gomez. His testimony at

the October 21, 1991 hearing has been incorporated in all tuberous sclerosis cases.

3. Mrs. Suel testified as follows regarding the first time she noticed David's eye-rolling episode:

Q [Richard Gage]: So explain to the Court, please, Amelia, just what you saw on that Friday evening [October 24, 1986].

A [Amelia Suel]: When I had him [David] on the couch laying down and changing him, I noticed that his eyes rolled up into his head. I could see the whites of his eyes and they rolled back down. And that's all I noticed.

Q: You didn't notice anything—nothing else abnormal?

A: No, nothing outside of that.

Q: Okay. So what happened next? What did you do next?

A: Well, it struck me as being unusual. I had never seen that happen with David before. I

from October 25 to November 1, Mrs. Suel noticed a few more eye-rolling episodes. On October 27, 1986, five days after his DPT vaccination, Mrs. Suel noticed that David began to sleep longer and was progressively sleeping longer each day over the course of a week.[4] The first medical record following the vaccination is dated November 10, 1986, 19 days after the DPT shot and indicates that David was "sleeping a lot more lately, 20 out of 24 hours."[5] On November 13, Mrs. Suel started noticing the eye-rolling again and telephonically reported the episodes to the doctor.[6] Between November 13 and November 16, 1986, the eye-rolling episodes continued and were now accompanied by head nodding which got progressively worse. Mrs. Suel called David's pediatrician, Dr. Pistulka, on November 26, 1986 and described David's symptoms. By that time David was having four seizures a day accompanied by hand jerking and head dropping. Dr. Pistulka told her that David appears to have a seizure disorder[7] and scheduled an EEG for that evening.[8] The EEG showed abnormal brain activity.[9] On November 29, 1986, David was admitted to Minneapolis Children's Medical Center. A CT brain scan confirmed a diagnosis of tuberous sclerosis and infantile myoclonic seizures secondary to TS.[10] David was put on Phenobarbital, Depakene and ACTH to control his seizures. Dr. John McDonald, a pediatric neurologist at Minneapolis Children's Medical Center who attended to David, told Mr. & Mrs. Suel that David should not receive pertussis vaccine in his future inoculations because it would aggravate his tuberous sclerosis.[11] Dr. McDonald referred David to Dr. Manual Gomez at the Mayo Clinic for further examination and evaluation. David's last ACTH

---

didn't know what was wrong. I thought I would mention it to Tom [Suel] later and see what he thought.
Q: And did you do that?
A: Yes, I mentioned it on the way home to him.
Q: And what did he think? What did he say?
A: Well, he said I don't think anything's wrong. Maybe it's because he's tired.
Tr. at 21–22.
Q [Mr. Gage]: Amelia, why is it that you remember specifically the date of that Friday [October 24, 1986], of the first time you saw his eyes going up in his head? ...
A [Amelia Suel]: Because it was the first time I noticed something unusual about David, something out of the ordinary....
Q: And why do you remember it as far as its relation to the DPT shot?
A: Because it was so soon after that vaccination and they say there are—there can be reactions from vaccines and I just figured maybe this [was] one of them, a temporary reaction.
Q: Who is—was this something the nurses told you, the doctor, something you knew from before? Who is "they"?
A: The nurse at the clinic, when they say there can be soreness, fussiness.
Q: So if I understand what you just said, you related that event to the DPT because it was so soon before?
A: Yes, I did.
Q: You thought that might have been a DPT reaction?
A: Yes, I did.
Tr. at 58–59.

4. Mrs. Suel testified:
Normally, he would be awake ten hours a day, on the average. Pretty soon, he was only awake maybe eight hours and less and less.

And then I started to be concerned because it wasn't getting any better, it wasn't changing back to the way he had been and I thought I'll just give him a week, see how he does. And when I knew that it had been 20 or more hours for each day for a week, I knew I'd better take him in [to the doctor]. It wasn't changing.
Tr. at 26.

5. See Med.Recs. at 8.

6. See Med.Recs. at 9. (There is a two-line handwritten entry on November 13, 1986. Although the writing is fairly illegible, the second line appears to read "? seizure(s).")

7. In describing her reaction when Dr. Pistulka indicated David might be experiencing seizures, Mrs. Suel testified as follows: "[I]t was a shock to me. The only type of seizure I had ever known about was when a person went unconscious and shook. I didn't know that the head dropping and all of that was a seizure." Tr. at 33.

8. The November 26, 1986 entry reads in part: "The mother now explains to me that the child has about 4 episodes a day of the eyes rolling up and shaking all over. It appears now definitely that he has a seizure syndrome." Med.Recs. at 9.

9. "Moderately to marked abnormal EEG because of almost continuous spike activity consistent with seizures." Med.Recs. at 20.

10. See Med.Recs. at 24.

11. Tr. at 37.

injection was on January 11, 1987. On January 16, 1987, his seizures recurred.[12]

At the time of the hearing in November 1991, David was 5 and one-half years old. He had the mental capacity of a two-year old and the verbal capacity of a twenty-month old. He had a 50 word vocabulary, but usually communicated one word at a time. He was not toilet-trained and had delayed motor skills, unable to do fine motor activities like hold a pencil.[13]

The medical records in this case indicate that David's seizure activity began sometime in early November 1986, between November 3 to November 15, 1986. Contemporaneous medical records do not report David's first eye-rolling experience occurring on October 26, 1986 or describe his seizure activity in relation to his October 24, 1986 DPT vaccination. (Presumably, this was due to the fact that at the time of David's early medical problems, Mr. & Mrs. Suel were not aware that the eye-rolling could constituted a seizure.) Nevertheless, Special Master Millman found Mrs. Suel to be credible ("eminently believable") and held that the petitioners satisfied their burden of proving on-Table onset of David's first seizure.[14]

### MEDICAL TESTIMONY

*Dr. Manuel Gomez.* Dr. Gomez is the world's leading expert on tuberous sclerosis. An excellent description and summary of Dr. Gomez's writings on tuberous sclerosis and his October 21, 1991 testimony is found in Special Master Millman's discussion in *Costa v. Secretary of HHS* ("Costa I"), No. 90–1476V, 1992 WL 47334 (Ct.Fed.Cl.Spec.Mstr. February 26, 1992) slip op. at pp. 6–24, which was condensed in *Costa v. Secretary of HHS*, 26 Cl.Ct. 866 (1992):

According to Dr. M. Gomez ... TS is defined as "a complex, genetically determined, variably expressed multisystem dis-

order of germ-cell organization and proliferation resulting in hamartomatous growth, and occasionally neoplasms, in one or more organs." [M. Gomez, *Tuberous Sclerosis* 63 (2d ed. 1988) ] [other citations omitted] TS causes fleshy growths, or lesions, to appear on some organs, including the brain. The two types of brain lesions caused by TS are: (1) nodules that grow in the center of the brain around the ventricles, which may grow sufficiently to block circulation of the spinal fluid (tumors); and (2) lesions that do not grow and are located on the surface of the brain or cerebral cortex and which are responsible for seizures (tubers). An individual with tubers may function normally and not experience seizures. However, if a child is diagnosed as having more than five lesions on the brain, he will most likely suffer from seizures. The most common symptom of tuberous sclerosis is seizures. "Although ... TS seizures may occur at any age, they most often begin during the first months of a patients life." [Gomez, *Tuberous Sclerosis* at 21] Another clinical feature of patients with TS is mental retardation. Since a significant correlation exists between TS-induced seizures and retardation, the medical community knows of no patient with TS and mental retardation who has not had seizures. Moreover, "the age of seizure onset and the presence and severity of the mental subnormality are directly related. Almost all patients whose seizures began in the first two years of life were mentally defective...." [*Id.* at 29] Therefore, the common medical policy is to avoid DPT immunization in all patients with infantile spasms and other seizures, as well as those known to have TS, because "immunizations with DPT have been reported to precede the onset of infantile spasms," and repetitive seizures influence the outcome of the disorder. [*Id.* at 611]

---

12. Tr. at 37–40.

13. Tr. at 50.

14. See Dec. at 13–14. The absence of a reference to a condition is much less significant than a reference which negates the existence of the condition. Since medical records typically record only a fraction of all that occurs, the fact that

reference to an event is omitted from medical records may not be very significant. *See Murphy v. Secretary of HHS*, No. 90–882V, slip op. at 6, 1991 WL 74931 (Cl.Ct.Spec.Mstr. April 25, 1991); *Clark v. Secretary of HHS*, No. 90–45V, slip op. at 3, 1991 WL 57051 (Cl.Ct.Spec.Mstr. March 28, 1991).

*Costa v. Secretary of HHS*, 26 Cl.Ct. at 867–68.

Dr. Gomez testified that it is very likely that the DPT vaccination "precipitated or triggered" David's seizure, if the seizure had occurred within 72 hours of the vaccination.[15] When asked if he thought the DPT vaccine significantly aggravated David Suel's tuberous sclerosis, he testified that DPT cannot aggravate TS, but may aggravate or trigger the symptoms of TS. He further testified that the vaccine could impair a TS patient's mental development.[16] Dr. Gomez advises against administering the pertussis vaccine to children with known TS so as to minimize the chance of seizure activity.[17] He stated that the incidence of seizure in TS children is much higher during the first year of life than at any other time and it is important to prevent seizure activity during that critical time.[18]

Dr. Gomez testified that the number of cortical lesions on the brain is directly related to the severity of the seizure activity experienced and the mental subnormality of the affected child, *i.e.*, the more brain lesions, the greater the possibility for mental retardation.[19] These lesions are present at birth and do not multiply.[20] Dr. Gomez testified that an MRI showed that David had many brain lesions and thus the child was probably going to be severely affected.[21] He stated that he had not seen a situation where such a severe MRI, showing multiple brain lesions, had resulted in normal mental development. He could not say whether normal development was possible in such a case.[22]

*Dr. Marcel Kinsbourne.* Dr. Kinsbourne is a pediatric neurologist who has testified in more than one hundred cases arising under the Vaccine Act. He testified that, given Dr. Gomez's testimony and writings on tuberous sclerosis that the early onset of seizures has a damaging effect on a TS child's mental development, he concluded that "the pertussis vaccine was the intermediary effect of causing the seizures and was responsible for David's severe deterioration in mental abilities."[23] His opinion was based on the timing

---

15. Gomez Tr. at 88.

16. Q [Robert Moxley]: Do you have an opinion as to whether or not the vaccine injury to David Suel [*et al.*], significant [sic] aggravated tuberous sclerosis?

    A [Dr. Gomez]: I have an opinion. It [DPT] does not aggravate tuberous sclerosis. It may aggravate the symptoms of tuberous sclerosis or bring them on, but tuberous sclerosis is established or structured as a lesion in the brain, which is not caused by any vaccine or anything acquired after birth. That happened before they were born.

    Q: Let me put that the other way. Would it significantly aggravate their mental condition, significantly aggravate their normal development?

    A: Yes, I have an opinion. I think it did impair their normal development. That includes the intelligence consisting of knowledge, the ability to acquire knowledge.
    Gomez Tr. at 88–89.

17. "I think that is a very good precaution not to give anybody who has tuberous sclerosis any chance of developing seizures, or if they have seizures not to give something that may exacerbate the seizures. I never have recommended to give any pertussis medication to any child that I know had tuberous sclerosis just to make sure. Based on my experience, I think it is better not to take any chance [of developing seizures]." Gomez Tr. at 48.

18. "The incidence of seizure is much higher in the first year of life in tuberous sclerosis more than any other time. If [Decker twins] had gone through the first year of life or the first two years of life and then developed seizures, which could have happened, the damage—the problem—would not have been as serious as it was having seizures so frequently at the age of five months. I think the timing is very important. You don't want to provoke or bring on the seizure. If there is any way to prevent that you should try to prevent it." Gomez Tr. at 48–49.

19. Gomez Tr. at 32–33, 102 and 104.

20. Gomez Tr. at 97.

21. Gomez Tr. at 147–148.

22. Q [Mr. Moxley]: Is an MRI that is as severe as David Suel's preclusive of normal development?

    A [Dr. Gomez]: I have not seen that situation where an MRI that bad has been a child who was normal. I don't recall that. I think I have seen lesions like I pointed in the other cases, but not that severe. I had not seen that. Whether it could happen, I don't know.
    Gomez Tr. at 154.

23. Tr. at 65.

of the DPT shot and the first seizure.[24] David was developing normally until the age of five months, when he received his first DPT vaccination, and from then on his mental development decelerated.[25] Dr. Kinsbourne, like Dr. Gomez, believes that pertussis vaccine can trigger a seizure disorder. Drawing on his own research on the effects on pertussis vaccine and after reading Dr. Gomez's book on tuberous sclerosis and article on the Decker twins, and other articles, Dr. Kinsbourne testified that he agrees with Dr. Gomez's opinion that children with TS should not be given pertussis vaccine because of the possible development of a seizure disorder and the resulting impairment of mental development.[26] He stated that in this case, seizures occurred earlier than they would have absent the DPT and thus adversely affected David's prognosis for mental development; "[h]ad [David] been permitted to have seizures later than he did, he would have been significantly better off but I cannot say how much." [27] It was his opinion that the later the development of seizure activity, even by a matter of months, the better the prognosis for mental development.[28] Dr. Kinsbourne testified the it was a good prognostic sign that David had been seizure-free before five months of age.[29] He agreed with Dr. Gomez that, even if David had not been given the pertussis vaccine, he

still would have experienced seizures at some point, but he could not state whether this would have occurred during his first year of life.[30]

*Dr. Huntley Hardison.* Dr. Hardison testified for the respondent. He is a pediatric neurologist. He testified that David's condition is not vaccine related and is consistent with the typical course of children with TS. He stated that children typically have infantile spasms between three and nine months of age and any relation to the DPT vaccination is coincidental.[31] It is his opinion that the DPT vaccine can cause a febrile seizure but not a residual seizure disorder.[32] He stated that pertussis vaccination can trigger the onset of infantile spasms in a child with TS, *i.e.*, it can "unmask an underlying disorder." [33] He also agreed with Dr. Gomez's statement that the earlier the onset of seizures in a TS child, the worse his prognosis for mental development.[34]

## DISCUSSION
### I. STANDARD OF REVIEW

■ The Special Master initially determines whether a petitioner is entitled to compensation under the Vaccine Act and, if so, the amount of the award. Review of the Special Master's decision by a judge of the U.S. Court of Federal Claims is available to

24. Tr. at 90.

25. Tr. at 67.

26. Tr. at 66–69.

27. Tr. at 91.

28. Q [Richard Gage]: Is it your opinion, Doctor, that a child who has a seizure at ten months of life or eight months of life, a TS child in this case, and David Suel specifically, would have a better prognosis for mental development than if he had the seizure at five months of life?

   A [Dr. Kinsbourne]: That is generally my opinion. It is not a matter of first year versus later as a dichotomy, it's a matter of the earlier [the onset of seizures], the worse.
   Tr. at 112. Dr. Kinsbourne referred to a computer generated curve in Dr. Gomez's book on tuberous sclerosis which relates age of onset of seizures to mental development. He states that the curve indicates that the intelligence level increases with increasing months of age; the later the onset of seizures—even as a matter of

months—the higher the intelligence level. Tr. at 113.

29. Tr. at 91.

30. Tr. at 106.

31. Tr. at 119–120.

32. Tr. at 122.

33. "I think there's a difference between triggering seizures and causing the seizures. If a person has an underlying problem such as tuberous sclerosis and is predisposed to develop infantile spasms, then the pertussis vaccination can trigger the onset of the infantile spasms and I think that was stated in several of the articles that I cited such as Bellman and also in Melchior. But that does not mean they caused the infantile spasms or caused the residual seizures. They just unmasked an underlying disorder." Tr. at 124.

34. Tr. at 125.

the parties pursuant to 42 U.S.C. § 300aa–12(e). The Special Master's decision must be upheld unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 42 U.S.C. § 300aa–12(e)(2)(B). *See also, Dolney v. Secretary of HHS*, 23 Cl.Ct. 337, 341–42 (1991); *Metzger v. Secretary of HHS*, 22 Cl.Ct. 123, 127–28 (1990); *Loe v. Secretary of HHS*, 22 Cl.Ct. 430, 432 (1991); *Mobley v. Secretary of HHS*, 22 Cl.Ct. 423, 426 (1991). The scope of review under the "arbitrary and capricious" standard is narrow and the court is not to substitute its judgment for that of the decision maker. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The touchstone of the arbitrary and capricious standard is rationality. *Hyundai Electronics Industries Co. v. United States Int'l Trade Com.*, 899 F.2d 1204, 1209 (Fed.Cir. 1990). If the decision maker has considered the relevant factors and has not made a clear error of judgment, the decision must be affirmed. *Id.* An abuse of discretion by a finder of fact occurs when (1) the court's decision is clearly unreasonable, arbitrary or fanciful, (2) the decision is based on an erroneous conclusion of law, (3) the court's findings are clearly erroneous, or (4) the record contains no evidence on which the court rationally could have based its decision. *Gamalski v. Secretary of HHS*, 21 Cl.Ct. 450, 451–52 (1990), citing *Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1022 (Fed.Cir.1986) (citations omitted).

## II. SIGNIFICANT AGGRAVATION, GENERALLY

Petitioners assert that administration of the DPT vaccine on October 22, 1986 significantly aggravated David's pre-existing tuberous sclerosis. The Vaccine Act covers significant aggravation of a seizure disorder. 42 U.S.C. § 300aa–13(a) provides as follows:

(1) Compensation shall be awarded under the Program to a petitioner if the special master or court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

The preponderance of the evidence standard requires that the special master believe that the existence of a fact is more probable than not before she may find in favor of the party who has the burden of proof. *See In re Winship*, 397 U.S. 358, 370–71, 90 S.Ct. 1068, 1075–76, 25 L.Ed.2d 368 (1970).

"Significant aggravation" is defined as "any change for the worse in a pre-existing condition which results in markedly greater disability, pain, or illness accompanied by a substantial deterioration of health." 42 U.S.C. § 300aa–33(4). The legislative history of the Vaccine Act clarifies the definition of "significant aggravation":

The committee has included significant aggravation in the Table in order not to exclude serious cases of illness because of possible minor events in the person's past medical history. This provision does not include compensation for conditions which might legitimately be described as pre-existing (*e.g.*, a child with monthly seizures who, after vaccination, has seizures every three and a half weeks), but is meant to encompass serious deterioration (*e.g.*, a child with monthly seizures who, after vaccination, has seizures on a daily basis). The Committee also intends that the time periods set forth in the Table apply to the significant aggravation in order for causation to be deemed to exist (*e.g.*, a significant deterioration of a seizure disorder after [DPT] vaccination must first become manifest within three days of the vaccination.).

H.R.Rep. No. 908, 99th Cong., 2d Sess. 15, 16, *reprinted in* 1986 U.S.Code Cong. & Admin. News 6287, 6344, 6356–57. 42 U.S.C. § 300aa–13(b)(2) establishes that significant aggravation must occur within a certain peri-

od of time after the administration of a vaccine:

> The special master or court may find the first symptom or manifestation of onset or significant aggravation of any injury, disability, illness, condition, or death described in a petition occurred within the time period described in the Vaccine Injury Table even thought the occurrence of such symptoms manifestation was not recorded or was incorrectly recorded as having occurred outside that period. Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset or significant aggravation of the injury, disability, illness, condition, or death described in the petition did in fact occur within the time period described in the Vaccine Injury Table.

According to the Vaccine Table, the time period for significant aggravation of a seizure disorder following administration of the DPT vaccine is three days. 42 U.S.C. § 300aa–14(a).

█ In an attempt to facilitate significant aggravation analysis under the Vaccine Act, the Court of Federal Claims in *Misasi v. Secretary of HHS*, 23 Cl.Ct. 322 (1991), articulated a four-pronged test to evaluate whether an individual suffered significant aggravation of a particular condition: the trier of fact must "(1) assess the individual's condition prior to administration of the vaccine, *i.e.*, evaluate the nature and extent of the individual's pre-existing condition, (2) assess the individual's current condition after the administration of the vaccine, (3) predict the individual's condition had the vaccine not been administered, and (4) compare the individual's current condition with the predicted condition had the vaccine not been administered. A petitioner satisfies Section 13(a)(1)(A) if he or she establishes by a preponderance of the evidence that the individual's current condition constitutes a significant aggravation of the individual's predicted condition had the vaccine not been administered." *Misasi*, 23 Cl.Ct. at 324. The *Misasi* standard does not alter the petitioner's initial burden when demonstrating presumed causation under 42 U.S.C. § 300aa–13(a)(1)(A). In making a *prima facie* showing of presumed causation, petitioners need not prove causation or disprove possible alternative causes for the deterioration in the child's pre-existing condition following the vaccination. *O'Connor v. Secretary of HHS*, 24 Cl.Ct. 428, 429 n. 2 (1991); *McClendon v. Secretary of HHS*, 24 Cl.Ct. 329, 334 (1991). In endeavoring to prove, by a preponderance of the evidence, that the injury was due to a factor "unrelated to the administration of the vaccine," the respondent must show that the alleged alternative cause was "the agent principally responsible for causing the petitioner's illness, disability, injury, condition or death." 42 U.S.C. § 300aa–13(a)(2)(B); *McClendon v. Secretary of HHS*, 24 Cl.Ct. at 334. The *Misasi* standard is implicated only after the respondent has met its burden under 42 U.S.C. § 300aa–13(a)(1)(B) of showing an actual alternative cause, *i.e.*, the natural progression of the preexisting condition rather than vaccination. *O'Connor v. Secretary of HHS*, 24 Cl.Ct at 430 n. 2.

As stated in *Schumacher v. Secretary of HHS*, 26 Cl.Ct. 1033 (1992), *aff'd*, 2 F.3d 1128 (Fed.Cir.1993), "there is nothing in the Vaccine Act or its legislative history that mandates the application of the *Misasi* analysis in claims alleging significant aggravation. *Misasi* is a judicially-created test which attempts to facilitate the analysis of significant aggravation cases by articulating a standard by which all such cases are decided. However, it is unwise to apply the analysis rigidly in all cases. The mere fact that a petitioner fails to satisfy all four prongs of the *Misasi* test does not *per se* indicate that no significant aggravation occurred in a particular case." Because the age of seizure onset is significant in tuberous sclerosis cases in that it has an effect on the level of mental underdevelopment that will occur, prongs three ("predict the individual's condition had the vaccine not been administered") and four ("compare the individual's current condition with the predicted condition had the vaccine not been administered") of the *Misasi* test may be difficult, if not impossible, to determine in these cases.

### III.  SPECIAL MASTER'S DECISION

█ After reviewing the evidence in this case and hearing the testimony of the wit-

nesses, Special Master Millman determined that, within three days after David received his first DPT vaccine on October 24, 1986, he suffered a seizure. However, she denied compensation, finding that respondent had successfully met its burden of showing that a factor unrelated to the vaccine, *i.e.*, David's tuberous sclerosis, is the ultimate cause of his current condition and that the petitioners failed to show the DPT vaccine caused significant aggravation to David's preexisting condition.

As aforementioned, the standard of review in Vaccine Act cases is extremely narrow. In its review, the Court of Federal Claims cannot substitute what would have been its judgment had it initially decided the matter or reviewed the matter *de novo*. However, after careful examination of the record in this case, and an analysis of case law in tuberous sclerosis cases under the Vaccine Act, it is determined that the decision of the Special Master must be reversed and the matter remanded.

In her decision, the Special Master reaches the following conclusion: "The court holds that although DPT was indeed a trigger to David's first seizure, DPT did not significantly aggravate his TS." (emphasis added) In light of Dr. Gomez's writings and undisputed testimony (regarding the correlation between the onset of seizures and mental retardation) and the Court's decision in *Costa v. Secretary of HHS*, 26 Cl.Ct. 866 (1992), this conclusion is untenable. The timing of seizure onset is highly significant in tuberous sclerosis cases in that the earlier a child experiences seizures, the greater the resulting retardation will be. Therefore, if the petitioner shows that a child, who had latent tuberous sclerosis and was seizure-free prior to the DPT vaccination, suffered an on-Table seizure onset which triggered the latent tuberous sclerosis, this is a "change for the worse in a preexisting condition which results in markedly greater disability, pain, or illness accompanied by a substantial deterioration of health" 42 U.S.C. § 300aa–33(4). Unless the respondent can then prove by the preponderance of the evidence that the onset seizure activity

would have occurred during that same time frame because of the underlying disorder, the petitioner is entitled to compensation under the Vaccine Act.

Dr. Gomez testified that tuberous sclerosis is a genetically-determined disease. The lesions in David Suel's brain were there *in utero* and were not caused by anything that occurred after his birth. Furthermore, according to Dr. Gomez, brain lesions do not multiply, thus rendering implausible any argument that DPT, or any other agent, could cause TS or could increase the number of brain lesions in a TS patient. If the onset of seizures has a deleterious effect on a patient with TS, and if, as in the case at bar, a DPT vaccination triggered a seizure in a seizure-free child with latent TS, it follows that the DPT vaccination "significantly aggravated" the preexisting condition. In TS cases, there is no logical difference between "triggering" symptomatology and aggravating TS because latent TS is aggravated through the appearance of symptomatology.

Furthermore, the facts in the case at bar are similar to those in another tuberous sclerosis case, *Costa v. Secretary of HHS*, 26 Cl.Ct. 866 (1992), a case in which compensation was awarded. Stephen Costa, like David Suel, had tuberous sclerosis which was latent prior to the vaccination. Stephen was six months old at the time of his DPT vaccination and onset of seizures; David was five months old. Stephen, like David, had more than five tubers on his brain, and thus was predisposed to experiencing seizures at some point in his childhood and to being mentally retarded to some degree.[35] Within 24 hours after the administration of his DPT shot, Stephen began to have seizures and developed massive infantile spasms which ultimately resulted in mental retardation. Discussing the theory of significant aggravation, the Court of Federal Claims stated:

> The effect of a pertussis vaccine on the TS child in this case clearly caused, for the purposes of the National Childhood Vaccine Injury Act, the "serious deterioration" contemplated by the framers of the Act. Indeed, the examples provided in the com-

---

35. Dr. Gomez testified that when a patient has more than five lesions on the brain, the potential

for seizure activity increases. Gomez Tr. at 20, 32–33.

mittee report demonstrate that a child who suffers one seizure per month prior to vaccination is well ensconced within the protective boundaries of the Act. *The court need not tarry to conclude that a seemingly normal child who has never seized, but who suffers a latent pre-existing condition that is awakened by the vaccine also falls well within the intent of Congress to compensate under the Act.* Costa v. Secretary of HHS, 26 Cl.Ct. at 870. (emphasis added)

The Court of Federal Claims also stated that, although Stephen's TS symptoms would have appeared eventually even absent the DPT, the vaccination "triggered" the latent condition and resulted in seizures and mental retardation. *Costa v. Secretary of HHS*, 26 Cl.Ct. at 871.[36] Because the *Suel* case closely parallels the *Costa* case, the differing results in the two cases cannot be reconciled. The Special Master differentiates these two cases, indeed placing *Costa* on one end of a recovery "spectrum" and *Suel* on the other end based solely on the difference in the severity of the on-table seizure activity, *i.e.,* Stephen had a more severe reaction to the vaccination than David. Although David Suel had "only" one seizure (eye-rolling episode) within three days after his DPT, the fact remains that he had no seizures prior to his vaccination and had progressively more seizures and other symptomatology in the days and weeks subsequent to his vaccination. As in *Costa,* the DPT in this case significantly aggravated David's preexisting condition. The vaccine "triggered" David's latent TS and unleashed seizures and mental retardation and like Stephen Costa, he is entitled to compensation.

In her Decision on Remand in *Costa v. Secretary of HHS,* No. 90–1476V, 1992 WL 365421 (Ct.Fed.Cl.Spec.Mstr. November 5, 1992), Special Master Millman correctly states that, "The presumption set forth in the statute [Vaccine Act] is that an on-Table onset of a seizure disorder removes petitioners' burden of proving causation. Respondent, in order to prevail, must prove that *TS alone caused the seizure disorder....* [n. 3 That DPT vaccination working in tandem with TS caused [Stephen Costa's] seizure disorder does not preclude petitioners from prevailing in this case. This is the very basis for finding significant aggravation: to aggravate a condition significantly, the vaccine must be working in tandem with the preexisting TS condition.]" *Id.* at pp. 10–11 (emphasis added). In the case at bar, the respondent did not show by the preponderance of the evidence that the seizure onset would have occurred at the age of five months *solely* because of the TS; indeed, the Special Master found that the DPT vaccine was "indeed a trigger to David's first seizure." Having failed to meet its burden of proof, the respondent can not prevail in this matter.

The facts in this case are distinguishable from those in *Jordan v. Secretary of HHS,* No. 91–1344V, 1992 WL 300901 (Fed.Cl.

---

**36.** Indeed, Judge Tidwell's discussion in *Costa* could easily be applied to the facts in the case at bar:

[P]rior to the vaccination, Stephen's TS was a latent disorder, since it was present but had as yet not manifested any visible symptoms. After the administration of the vaccine, Stephen began to seize within twenty-four hours, and developed massive infantile spasms which ultimately resulted in mental retardation, the condition in which he remains today. According to Dr. Gomez's testimony, a TS child's prognosis for normal intelligence becomes substantially more favorable the longer the child develops without seizing. However, it is clear that a child, such as Stephen, who has more than five tubers on his brain, will suffer seizures at some time in his childhood and eventually retard over time. If Stephen had not received the vaccination when he did, each day without a TS-induced seizure would have delayed, though not avoided, the onset of retardation. Although Stephen was predisposed to have seizures and mental retardation because he had more than five tubers on his brain, the vaccine activated the clinical manifestations of the latent condition, thereby significantly aggravating the condition. His TS symptoms, had he *not* received the vaccine, would have appeared gradually as he developed. Here, within twenty-four hours after the vaccine was administered, Stephen was seizing uncontrollably and became severely retarded far sooner and more severely than had he not had the DPT vaccine. By triggering Stephen's latent condition, the vaccination unleashed seizures and mental retardation. Given the proximity of time between the administration of the vaccination and the onset of the seizure, the vaccine, and not the TS, is more likely to be the etiology of the seizures.

*Costa v. Secretary of HHS,* 26 Cl.Ct. at 871.

Spec.Mstr. Oct. 2, 1992), *aff'd*, No. 91–1344V (Fed.Cl. Mar. 31, 1993), which is discussed in the Special Master's decision. Dec. at 18–19. Matthew Jordan was born with a unique autosomal recessive disorder and had significant medical problems prior to the receipt of his third DPT shot. Matthew had an older sibling, Kara, with the same autosomal recessive syndrome. Both children were significantly retarded before the DPT vaccinations. A comparison of Kara and Matthew's medical records showed nearly identical symptomatology: both had significant craniofacial dysmorphology, partial agenesis of the corpus callosum, neuromigrational defect, microcephaly, failure to thrive, renal hypoplasia and genital abnormalities, pulmonary maldevelopment, and seizures. *See Jordan v. Secretary of HHS*, Fed.Cl.Spec.Mstr. slip op. at 20, 36. Matthew's medical records documented developmental delay and seizures. *Id.* at 23. Kara experienced seizures when she was a newborn and then developed infantile spasms **at the same age as Matthew**. *Id.* Matthew had a seizure within 3 days after receipt of his third DPT shot. Medical expert testimony in that case indicated that the DPT at most "unmasked" Matthew's underlying seizure disorder, because the records indicate that seizures would have eventually occurred even absent the DPT vaccination. *Id.* at 22. This opinion was based on the fact that Matthew's sister Kara had seizures and infantile spasms, thus indicating that these symptoms are part of the underlying disorder. *Id.* at 24. Dr. Raffel, respondent's expert, testified that Matthew would have had seizures under any circumstance; at most, DPT precipitated the onset of seizures, but they would have occurred anyway "within a week or a month." *Id.* Special Master Millman denied compensation in that case, finding that Matthew's

present state of health was due to a factor unrelated (the autosomal recessive disorder) to the administration of the vaccine, and that petitioners failed to prove significant aggravation.[37]

In contrast, David Suel was asymptomatic prior to his first DPT shot. His tuberous sclerosis was latent. Although, in all probability, seizure activity would have occurred at some point, unlike Matthew Jordan, there was no predictable time frame for the onset of seizure activity. In *Jordan*, as the Special Master noted in that opinion, Matthew was following a virtually identical course as his sister Kara; Kara had experienced developed infantile spasms at the same age as Matthew. It was not illogical to conclude, therefore, that Matthew would have experienced seizures during that time frame even absent the DPT vaccination. In *Suel*, the timing of the onset of seizure activity absent the vaccination is unknown. Furthermore, in children afflicted with tuberous sclerosis, a delay in the onset of seizure activity is critical to minimize the level of mental underdevelopment.

### CONCLUSION

Dr. Gomez testified that the longer a TS child remains seizure-free, the better his prognosis for mental development. That is a pivotal issue in tuberous sclerosis cases. The earlier the onset of seizures in childhood, the greater the severity of mental retardation. The avoidance of potential seizure activity is the very reason behind the accepted medical policy of advising parents of children with known TS (or other neurological problems) to avoid the pertussis vaccine. Because of the number of brain lesions, it is unlikely that David would have developed normally. The

---

**37.** In that decision the Special Master held:
Even if DPT triggered Matthew's seizure disorder, there exists no causal nexus between the vaccine and Matthew's ultimate damage.... Rather, the autosomal recessive disorder is responsible for the ultimate damage to Matthew.

Analyzing this case under the allegation of significant aggravation, the court holds that petitioners have failed to satisfy their burden of proof. Respondent has shown under the third and fourth prongs of the test enunciated in *Misasi v. Secretary of HHS*, 23 Cl.Ct. 322

(1991), that Matthew's condition would have been the same even if the vaccine had not been administered. Since petitioners failed to show any difference in the ultimate outcome of Matthew's condition regardless of vaccination, they have not proven significant aggravation. Matthew's present state of health is a substantial deterioration from his condition preceding the DPT vaccination, but this is indicative of the unfortunate congenital condition with which he was born and from which his sister Kara died.
Slip op. at 37–38.

clinical manifestations of his TS, which had been latent until his first DPT shot, would probably have manifested themselves at some point in his development. None of the medical experts could predict how long David would have remained seizure-free without the DPT shot and it is, therefore, impossible to predict the level of David's mental condition absent the October 24, 1986 DPT vaccination. However, the fact remains that he was asymptomatic and seizure-free until two days after his first DPT shot. It was from that date and in the following weeks that David started to exhibit the clinical manifestations of his tuberous sclerosis. That David could have had a seizure at any time does not mean that he would have had a seizure on October 26, 1986, and the longer he remained seizure-free, the better his prognosis for normal mental development. The onset of seizures in a tuberous sclerosis case is, in and of itself, significant because of the correlation between age of seizure onset and level of mental retardation. David Suel's level of mental retardation is a result of the onset of seizures that occurred after his first DPT shot. In triggering the seizure which unleashed the tuberous sclerosis, the October 24, 1986 DPT vaccination significantly aggravated David's latent preexisting tuberous sclerosis.

Accordingly, it is **ORDERED** that the decision of the Special Master is reversed and the case is remanded for determination of the compensation required.