Patricia L. SHIFFLETT, legal representative of Kurt M. Shifflett, a minor, Petitioner,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 91–172V.

United States Court of Federal Claims.

Jan. 24, 1994.

Andrew W. Dodd, Torrance, CA, for petitioner.

Michael P. Milmoe, Torts Branch, Dept. of Justice, Civ. Div., for respondent, with whom were Gerard W. Fischer, Asst. Director, Torts Branch, Civ. Div., John Lodge Euler, Deputy Director, Torts Branch, Civ. Div., Helene M. Goldberg, Director, Torts Branch, Civ. Div., and Frank W. Hunger, Asst. Atty. Gen.

1. Hypoxia is a deficiency of oxygen reaching the tissues of the body. Dorland's Illustrated Medi-

## OPINION

MARGOLIS, Judge.

This vaccine case comes before the court on petitioner's motion for review of a special master's decision denying compensation for an alleged vaccine-related injury. Petitioner, Patricia Shifflett, as the legal representative of her minor son, Kurt Shifflett, asserts that the special master made legal and factual errors in finding no basis for recovery under the National Vaccine Injury Compensation Program. Specifically, petitioner argues that this case may be reviewed as a Table Injury case, which allows petitioner a presumption of causation. Petitioner also maintains the evidence establishes actual causation. Respondent, the Secretary of the Department of Health and Human Services, contends that the special master fully and properly considered all legal and factual issues in denying petitioner's claim. After reviewing the record, and after hearing oral argument, the court reverses the special master's decision and remands the case for consideration of damages.

## FACTS

Petitioner's infant son, Kurt Shifflett ("Kurt"), received a diphtheria, pertussis and tetanus ("DPT") vaccination and an oral polio vaccination ("OPV") in Utah on June 16, 1982 at the age of two months. Kurt was ill at the time of the inoculations. Within five minutes of receiving the vaccines, Kurt began crying inconsolably. This condition persisted for five days. On June 21, 1982, Kurt went into respiratory arrest—he stopped breathing. Kurt was hospitalized from June 21, 1982 to July 10, 1982 and treated for hypoxia.[1] Kurt's treating physicians at that time did not diagnose any form of paralytic polio. Currently, Kurt suffers from symmetrical, nonprogressive paralysis. Kurt is not retarded, though he is incontinent and has difficulty moving his mouth and tongue. Kurt also has spastic limbs and flaccid neck muscles. After initially filing a claim for injuries related to both vaccinations, petitioner exclusively pursued compensation for

cal Dictionary 810 (27th ed. 1988).

OPV-related injuries. Prior to a hearing before a special master of this court, the parties stipulated that respondent had no alternative diagnosis based upon reasonable medical probability.

The special master heard testimony from three medical experts in this case: Dr. Peter Lichtenfeld and Dr. John Tilelli testified for petitioner; and Dr. Ethan B. Russo testified for respondent. These experts disagreed about the cause of Kurt's respiratory arrest and current condition. According to Dr. Lichtenfeld and Dr. Tilelli, the OPV induced bulbar paralytic polio,[2] which caused the respiratory failure. Dr. Lichtenfeld and Dr. Tilelli based their opinions on Kurt's spastic limbs, flaccid neck muscles, the elevated white blood cell count in Kurt's spinal fluid during his hospitalization, the medical records from that time, the presence of no enterovirus[3] except polio Type II in a stool sample taken from Kurt six days after the vaccination, and the absence of any contemporaneous reports of enteroviruses in Utah. Dr. Russo, however, could not trace Kurt's injuries to the OPV to a reasonable degree of medical certainty. He testified that hypoxia alone could have caused the spastic limbs, flaccid neck muscles, and elevated white blood cell count. He also discounted the significance of finding only polio virus Type II in Kurt's stool sample because a high percentage[4] of OPV recipients shed the virus in their stool without contracting the disease, and other enteroviruses often go undetected by such testing. Dr. Russo asserted that Kurt's respiratory failure was most likely due to a near miss SIDS[5] situation.

The special master denied petitioner's claim under the National Vaccine Injury Compensation Program. The special master concluded that petitioner could not establish a Table Injury without a contemporaneous, definitive diagnosis of paralytic polio. Further, the special master found that petitioner failed to show by a preponderance of the evidence that the OPV in fact caused Kurt's injuries. This appeal followed.

## DISCUSSION

 This case raises an important issue of statutory construction regarding the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa–1 to –34 ("Act" or "Vaccine Act"). Specifically, the court considers the showing necessary to trigger the Act's Table Injury presumption for OPV. The court finds the special master erred as a matter of law in requiring a contemporaneous, definitive diagnosis of paralytic polio to establish that presumption.

The Vaccine Act provides that this court may "set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa–12(e)(2)(B). This section contains three separate standards of review: "[f]act findings are reviewed . . . under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard." *Munn v. Secretary of Health and Human Servs.*, 970 F.2d 863, 870 n. 10 (Fed.Cir.1992). Petitioner argues that the special master failed to apply the correct legal standards for demonstrating a Table Injury and for showing causation in fact. These are issues of law; therefore the court reviews them *de novo*. *Bradley v. Secretary of Health and Human Servs.*, 991 F.2d 1570, 1574 n. 3 (Fed.Cir.1993) (stating "legal conclusions are, of course, always reviewed *de novo*"). Peti-

---

**2.** Bulbar paralytic polio is a form of paralytic polio that affects the brain stem. *Id.* at 1327.

**3.** Enteroviruses are a class of viruses including polio Type II. *Id.* at 561.

**4.** The special master suggested this figure was as high as 88 percent, to which Dr. Russo responded, "That's correct. I bet that's correct." Transcript, May 20, 1992 (Tr. II) at 128. Dr. Russo admitted, however, that he did not have his own estimate for this percentage.

**5.** Sudden Infant Death Syndrome. According to Dr. Russo, "there are 70,000 cases of SIDS in [Kurt's] age group in the U.S. each year. And in a few instances, there are situations where the child does make it to the hospital and with advanced medical care recovers. But this would seem to be emminately [sic] more likely than the alternative explanation of polio meningoencephalitis leading the hypoxia." Tr. II at 122–23.

tioner also argues that the special master erred in finding the evidence insufficient to establish that the OPV actually caused Kurt's injuries. This is a question of fact which the court will reverse only if the special master's decision is arbitrary or capricious. *Hines v. Secretary of Health and Human Servs.*, 940 F.2d 1518, 1527 (Fed.Cir.1991).

The Vaccine Act authorizes recovery for vaccine-related injuries or deaths. The Act allows a petitioner to prove that a vaccination caused an injury in two ways. First, a petitioner may prove causation by showing that the injury is listed on the Vaccine Injury Table ("Table"), 42 U.S.C. § 300aa–14(a), and that the first symptom or manifestation of the injury occurred within the time frame specified on the Table. 42 U.S.C. § 300aa–11(c)(1)(C)(i). In other words, a petitioner can trigger a presumption of causation by showing a Table Injury. Alternatively, a petitioner may recover under the Act by showing that the vaccine, more likely than not, caused the injury. *Id.* at § 300aa–11(c)(1)(C)(ii). These two approaches differ significantly. Under the former, a petitioner need only show that, more likely than not, a Table Injury followed a vaccination within a specified time. Under the latter, a petitioner must show: (1) an injury, and; (2) that the vaccine in fact caused the injury, *both* by a preponderance of the evidence.

The special master applied the wrong legal standard in reviewing petitioner's claim for an OPV Table Injury. The OPV Table Injury is paralytic polio. *Id.* at § 300aa–14(a)(III)(A). The time frame is 30 days. *Id.* The special master held that petitioner could not trigger the Table's presumption because paralytic polio was not diagnosed within 30 days of the OPV.[6] The special master explained that "[w]hen a contemporaneous diagnosis is not performed, the petitioners face an evidentiary challenge since a definitive diagnosis ·is no longer possible. *Ergo*, in cases where such a diagnosis is lacking, petitioner's standard of proof is similar to traditional tort standards of causation-in-fact." *Shifflett v. Secretary of Health and*

*Human Servs.*, No. 91–0172V 1993 WL 397743 (Fed.Cl.Spec.Mstr., Sept. 23, 1993) [hereinafter *Decision* ] at 4. The special master based his analysis on *Radika v. Secretary of Health and Human Servs.*, No. 91–1084V 1992 WL 93239 (Cl.Ct.Spec.Mstr., Apr. 17, 1992). In *Radika*, the chief special master held that the Act's language directed the court to find a contemporaneous diagnosis of paralytic polio before invoking a Table Injury presumption for OPV. As the chief special master stated,

> in oral polio cases without a contemporaneous diagnosis, petitioners receive little assistance from the Vaccine Injury Table. In DPT cases, Congress eliminated the DPT from the causation chain if petitioners can prove the occurrence of certain injuries within prescribed time frames. However, with the oral polio vaccine, *paralytic polio* is the Table injury. In the absence of a contemporaneous diagnosis of the disease, apparently there is no definite means of diagnosing polio. Accordingly, petitioners must rely on traditional, more circumstantial methods of proof, including ruling out other potential causes, *e.g.*, other enteroviruses.

*Id.* at 3 (emphasis in original). The special master's use of this contemporaneous, definitive diagnosis standard as a litmus test for petitioner's Table Injury claim is beyond question. *See Decision* at 4 n. 10 ("In the case of other vaccines, petitioners may gain the operation of the Table presumptions if they are able to demonstrate, at the time of the hearing, that the symptoms suffered by the injured person within the Table time frames constituted the onset of a Table injury. However, because of the impossibility of establishing a diagnosis of polio after the fact, this avenue of proof is unavailable in this case.")

This court finds that the special master erred as a matter of law in reviewing petitioner's claim because the Vaccine Act requires neither a *contemporaneous* nor *definitive* diagnosis of paralytic polio to establish

---

**6.** At times, the special master suggested that a diagnosis within as many as 120 days would be sufficiently contemporaneous. *See* Tr. II at 4–5. Whether the special master applied a 30, 60, 90,

or 120–day time limit does not affect this court's reasoning because any such limit violates the Act.

an OPV Table Injury. The special master's application of that standard was inconsistent with the Act's plain language and purpose.

The plain language of the Vaccine Act precludes this court and its special masters from denying petitioner the benefit of the Table's presumption solely because there was no *contemporaneous* diagnosis of paralytic polio. The Act specifically entitles petitioner to the presumption if petitioner can show, at any time, that Kurt had paralytic polio within 30 days of the OPV. According to the Act,

> [t]he special master or court may find the first symptom or manifestation of onset ... of an injury, disability, illness, condition, or death described in a petition occurred within the time period described in the Vaccine Injury Table *even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period.*

42 U.S.C. § 300aa–13(b)(2) (emphasis added). Moreover, the Act does not compel petitioner to establish a *definitive* diagnosis of paralytic polio. The Act's mandate in this regard is clear: petitioner must show the first symptom or manifestation of paralytic polio by a preponderance of the evidence. *Id.* at § 300aa–13(a)(1), § 300aa–13(b)(2).

This result is consistent with the Vaccine Act's purpose. Congress intended the Vaccine Act to establish a no-fault compensation system through which "awards [could] be made to vaccine-injured persons quickly, easily, and with certainty and generosity." H.Rep. No. 908, 99th Cong., 2d Sess. 3, *reprinted in* 1986 U.S.C.C.A.N. 6287, 6344. To this end, Congress designed the Vaccine Table Injury to be overinclusive. Congress expressly recognized that some children whose injuries were not vaccine-related would recover through the Table's presumption. As the legislative history reveals,

> [t]he Committee recognizes that there is public debate over the incidence of illnesses that coincidentally occur within a short time of vaccination.... The Committee anticipates that the research on vaccine injury and ... safety ... will soon provide more definitive information about the incidence of vaccine injury and that, when

such information is available, the Secretary ... may propose to revise the Table.... Until such time, however, the Committee has chosen to provide compensation to all persons whose injuries meet the requirements of the petition and the Table and whose injuries cannot be demonstrated to be caused by other factors.

*Id.* at 6359. The Act only requires petitioner to show that, more likely than not, Kurt suffered paralytic polio within 30 days of the OPV. Because the special master did not use this standard, the court must reverse his decision denying petitioner a Table Injury presumption.

The Vaccine Act authorizes this court to "issue its own findings of fact and conclusions of law" when a special master abuses his discretion. 42 U.S.C. § 300aa–12(e)(2)(B). "An abuse of discretion by a finder of fact occurs when ... the decision is based on an erroneous conclusion of law...." *Suel v. Secretary of Health and Human Serv.*, 31 Fed.Cl. 1, 7 (1993) (citing *Gamalski v. Secretary of Health and Human Serv.*, 21 Cl.Ct. 450, 451–52 (1991)); *see also Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1022 (Fed.Cir.1986). The court need not defer to the special master's fact finding in this case because the special master abused his discretion by applying the wrong legal standard. The court makes its own findings of fact from the record.

■ Applying the appropriate legal standard for an OPV Table Injury, this court finds petitioner entitled to recovery under the Act. The record before this court establishes by a preponderance of the evidence that Kurt suffered bulbar paralytic polio within 30 days of receiving the OPV. Patricia Shifflett and Jeff Shifflett, Kurt's parents, both testified that Kurt began crying inconsolably immediately after the OPV, a condition which lasted for five days and culminated with the respiratory arrest. Transcript, October 15, 1991 (Tr. I) at 32–39, 47–48, 52–54, 56, 59, 62, 169–75. Diana Watson, the Shifflett's next-door neighbor, corroborated the account of an apparent reaction to the vaccine. *Id.* at 203–06, 208–12, 217.

Dr. Lichtenfeld, a qualified expert in the field of neurology, opined that the OPV induced bulbar paralytic polio. He testified that the polio virus Kurt received from the vaccine attacked his brain stem. Dr. Lichtenfeld explained that the polio virus caused neurological damage and paralyzed Kurt's diaphragm, precipitating the respiratory arrest. Dr. Lichtenfeld based his conclusion in part on an examination of Kurt. Dr. Lichtenfeld observed that Kurt has flaccid neck muscles, an indication of polio, and spastic limbs, a sign of hypoxia. Tr. II at 22–23, 37–38. He also found that Kurt has difficulty speaking and is incontinent, though not retarded. Dr. Lichtenfeld testified that this combination of impaired brain stem functions and normal intellect was more consistent with bulbar paralytic polio than hypoxia. *Id.* at 42, 56–57. According to Dr. Lichtenfeld, Dr. Russo's theory that all of Kurt's injuries could be traced to hypoxia did not fit the facts of this case. Dr. Lichtenfeld identified two CAT scans from Kurt's hospitalization which showed no frontal lobe damage, contrary to Dr. Russo's theory that Kurt suffered generalized brain damage from hypoxia alone. Tr. II at 37–38, 42, 56, 113, 183.

Dr. Lichtenfeld also based his conclusions on Kurt's medical records. According to Dr. Lichtenfeld, those records indicate that Kurt suffered meningoencephalitis following the OPV. He cited as an example one entry by the pediatric neurologist that reads: "Central nervous system insult most likely a combination of post hypoxic-ischemic encephalopathy and meningoencephalitis." Tr. II at 21. Dr. Lichtenfeld further explained that the elevated white blood cell counts found in Kurt's spinal fluid on three different occasions[7] were typical of a viral encephalitis affecting the brain stem. *Id.* at 75–76. In contrast to this analysis, Dr. Russo testified that he did not believe Kurt ever had meningoencephalitis. *Id.* at 106. He readily admitted that his opinion contradicted the contemporaneous medical records. *Id.* Nevertheless, Dr. Russo claimed the low white blood cell counts in Kurt's spinal fluid and the lack of predominant polymorphonuclear

leukocytes were inconsistent with meningoencephalitis and polio. *Id.* at 108. He cited several studies which documented white blood cell counts from 19 to 500 in polio victims. *Id.* at 108–09. On cross examination, however, Dr. Russo admitted that these studies did not delineate cases of bulbar paralytic polio from cases of polio primarily affecting the limbs. *Id.* at 162–63. Dr. Lichtenfeld explained that such a distinction would be significant; that white blood cell counts in the spinal fluid should be lower for bulbar paralytic polio cases because that injury occurs in a different place. *Id.* at 75–76. Finally, Dr. Lichtenfeld noted that the medical records documented that Kurt had facial diplegia,[8] a condition he had never seen in conjunction with hypoxia. *Id.* at 185.

Both Dr. Lichtenfeld and Dr. Tilelli supported their conclusions that Kurt contracted polio from the OPV with Kurt's medical records and Utah state health records. Dr. Lichtenfeld and Dr. Tilelli highlighted the fact that testing of Kurt's stool for enteroviruses revealed the presence of only the polio Type II virus. They concluded from this that, more likely than not, Kurt's injuries were caused by polio and not some other enterovirus. They recognized that many OPV recipients shed the polio virus in their stool. Therefore, they did not rely on the stool sample analysis directly. Rather, they relied on the fact that no other enterovirus was found. They conceded that other enteroviruses may escape detection, but they could not ignore the fact that nothing but a polio virus was found in Kurt's system. Dr. Tilelli testified that enteroviruses are extremely contagious and that state health officials did not report any incidents of an enterovirus which could have caused Kurt's injuries in Utah during 1982. Transcript, September 8, 1992 (Tr. III) at 218. These uncontradicted facts directly support the conclusion that the OPV, and not some other enterovirus, caused Kurt's problems.

In essence, Dr. Russo presented a statistical analysis of this case by testifying about Kurt's injuries based on probabilities. He stated that the chances of Kurt contracting

---

7. Those readings were 10, 4 and 8. *Decision* at 7 n. 12.

8. Facial diplegia is paralysis affecting both sides of the face. Dorland's at 478.

bulbar paralytic polio from an OPV and sustaining the injuries at issue here were extremely remote. Tr. II at 105–06, 109, 116, 117, 122–23, 162. He compared those odds to the frequency of SIDS and near-miss SIDS cases to conclude that Kurt did not contract polio from the OPV. Dr. Russo repeatedly claimed that enteroviruses other than polio were possible causes of Kurt's injuries. *See, e.g., id.* at 118, 120. He testified to the effect that without a contemporaneous, definitive diagnosis of bulbar paralytic polio, he could not accept Dr. Lichtenfeld's analysis.[9] Dr. Russo's opinion cannot persuade this court given his apparent use of an inappropriate legal standard. Moreover, as Dr. Lichtenfeld pointed out in rebuttal, Dr. Russo's analysis failed to account for the fact that Kurt's case was inherently exceptional because of Kurt's age at the time of the inoculation and the general scarcity of bulbar paralytic polio. *Id.* at 184–86. Finally, the court rejects Dr. Russo's opinion because he did not sufficiently rebut the evidence regarding the treating physicians' inability to identify causative agents other than the OPV, and ignored state health reports about the incidence of enteroviruses in Utah during 1982. This court does not find Dr. Russo's statistical analysis compelling in light of the direct evidence petitioner presented.

■ The court also reverses the special master's decision regarding actual causation because the special master's emphasis on a contemporaneous, definitive diagnosis affected that part of his analysis. *See, e.g.,* Tr. II at 7. In order to show causation in fact, petitioner must offer "proof of a logical sequence of cause and effect showing that the

vaccination was the reason for the injury. A reputable medical or scientific explanation must support this logical sequence of cause and effect." *Grant v. Secretary of Health and Human Servs.,* 956 F.2d 1144, 1148 (Fed.Cir.1992). The special master applied a higher standard by requiring petitioner to eliminate enteroviruses other than polio from the realm of possible causes. Tr. II at 119. The special master concluded that such a showing was necessary here because petitioner did not have a contemporaneous, definitive diagnosis of polio. *Id.* at 7. While petitioner may prove actual causation by ruling out other factors, the Vaccine Act does not so mandate.

Finally, petitioner argues that the special master improperly considered Dr. Russo's testimony regarding agents other than the OPV as possible causes of Kurt's injuries. Petitioner claims the pre-trial stipulation and section 300aa–13(a) of the Act preclude the special master from attaching any significance to Dr. Russo's testimony. This position is without merit. Petitioner misunderstands her burden. The stipulation and section 300aa–13(a) are relevant only if petitioner first establishes actual causation. In a vaccine claim which is not a Table Injury case, a petitioner must first show that the vaccine in fact caused the injuries. Once that burden is met, respondent may counter by establishing that "factors unrelated to the administration of the vaccine" caused the injuries. 42 U.S.C. § 300aa–13(a)(1)(B). The stipulation and section 300aa–13(a) define the contours of such a showing. By entering into the stipulation, respondent conceded that it could not prove any "factors

---

**9.** Dr. Russo testified as follows regarding Kurt's condition:

Q: [Mr. Milmoe]: Okay. Can you tell us briefly the basis for your opinion?
A: [Dr. Russo]: .... I find no *compelling proof* that polio infection occurred.... I do not believe that it's possible to prove that polio is responsible for the current situation. Tr. II at 100–01 (emphasis added).
Q: [Mr. Milmoe]: Okay. From your review of the [medical] records, you didn't see anything in the record that would indicate that a diagnosis of polio was made within 30 days or at any time thereafter; did you, Doctor?
A: [Dr. Russo]: No, I saw nothing of the sort. *Id.* at 131.

Q: [the Special Master]:.... Then [the medical record] goes on ... "neurological consult indicated evidence of brain stem involvement consistent with cortical and brain stem encephalitis." And what is your opinion on that?
A: [Dr. Russo]: Well, again I'd just basically disagree. I don't know how else you show, you know, in those days when an encephalitis was thought to be present they sometimes went so far as to do a brain biopsy. And that sure wasn't done. But that would be *the only proof positive* unless you recovered a virus in terms of culturing one, a known pathogen that fit with the story here. And that just didn't happen. *Id.* at 149 (emphasis added).

unrelated" if petitioner met her burden. Similarly, section 300aa–13(a)(2)(A) limits a respondent's proof for "factors unrelated" by excluding "any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness or condition." This case did not implicate either the stipulation or section 300aa–13(a) because the special master found that petitioner did not prove actual causation. *Id.* at § 300aa–13(a)(2)(A).

## CONCLUSION

The court finds that the special master erred in reviewing petitioner's claim for both a Table Injury and actual causation because the special master applied a contemporaneous, definitive diagnosis standard. The court reverses the special master's decision denying compensation, and remands the case to the special master for consideration of damages.